IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| ROBERT GRAY and MAKRUM GEORGE, individually, and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>BMW OF NORTH AMERICA, LLC and BMW AKTIENGESELLSCHAFT,<br><br>Defendants. | No.: 2:13-cv-3417 (WJM)(MF) |

_____

**PLAINTIFFS' REPLY BRIEF IN FURTHER SUPPORT OF MOTION FOR AWARD OF ATTORNEYS' FEES, EXPENSES AND INCENTIVE AWARDS**
_____

Matthew R. Mendelsohn
**MAZIE SLATER KATZ & FREEMAN, LLC**
103 Eisenhower Parkway
Roseland, New Jersey 07068
Telephone: (973) 228-9898
Facsimile: (973) 228-0303

Payam Shahian (admitted *pro hac vice*)
**STRATEGIC LEGAL PRACTICES, APC**
1875 Century Park East, Suite 700
Los Angeles CA 90067
Telephone: (310) 277-1040
Facsimile: (310) 943-3838

*Attorneys for Plaintiffs and the Class*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................. ii

PRELIMINARY STATEMENT .......................................................................................... 1

LEGAL ARGUMENT .......................................................................................................... 2

    POINT I

        PLAINTIFFS' FEE APPLICATION SHOULD BE EVALUATED
        USING THE PERCENTAGE-OF-RECOVERY METHOD ................................. 2

    POINT II

        CLASS COUNSEL'S APPLICATION IS SUFFICIENTLY SPECIFIC
        TO DEMONSTRATE THAT THE REQUESTED FEES ARE REASONABLE ................. 4

    POINT III

        PLAINTIFFS HAVE PRESENTED A REASONABLE VALUE
        OF THE SETTLEMENT ........................................................................................ 8

CONCLUSION .................................................................................................................... 15

CERTIFICATE OF SERVICE............................................................................................. 17

i

## **TABLE OF AUTHORITIES**

**CASES**

*Alin v. Honda Motor Co.*, No. 08-4825 KSH, 2012 WL 8751045
  (D.N.J. Apr. 13, 2012) ............................................................................................. 3,5,15

*Dewey v. Volkswagen*, 728 F.Supp.2d 546 (D.N.J. 2010) ............................................. 2,3,4

*Doherty v. Hertz Corp.*, No. 10-359-NLH, 2014 WL 2916494 (D.N.J. June 25, 2014) ................... 15

*Dyer v. Wells Fargo Bank, N.A.*, No. 13-CV-02858-JST, 2014 WL 5369395
  (N.D. Cal. Oct. 22, 2014) ............................................................................................ 4

In *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980) ........................................................ 15

*In re Diet Drugs*, 582 F.3d 524 (3d Cir. 2009) ................................................................. 3

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*,
  55 F.3d 768 (3d Cir. 1995) .......................................................................................... 3

*In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*,
  148 F.3d 283 (3d Cir. 1998) ........................................................................................ 5

*In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294 (3d Cir. 2005) .......................................... 5

*Landsman & Funk, P.C. v. Skinder-Strauss Assocs.*, No. 08-3610-CLW,
  2015 WL 2383358 (D.N.J. May 18, 2015), aff'd, 639 F. App'x 880 (3d Cir. 2016) ...................... 15

*Lindy Bros. Builders, Inc. of Phila. v. American Radiatory & Standard
  Sanatory Corp.*, 487 F.2d 161 (3d Cir. 1973) ............................................................. 5

*Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423 (2d Cir. 2007) ...................... 15

*McLellan v. LG Electronics USA, Inc.*, No. 2:10-cv-03604,
  2012 WL 686020 (D.N.J. Mar. 2, 2012) ..................................................................... 2

*Rode v. Dellarciprete*, 892 F.2d 1177 (3d Cir. 1990) ............................................... passim

*Saint v. BMW of N. Am.*, No. 12-6105-CCC, 2015 WL 2448846 (D.N.J. May 21, 2015) ............... 15

*Skeen v. BMW of N. Am., LLC*, 2016 WL 4033969 (D.N.J. July 26, 2016) ...................... 8

*Weiss v. Mercedes-Benz of N. Am.*, 899 F. Supp. 2d 1297 (D.N.J. 1995) ....................... 14

**PRELIMINARY STATEMENT**

Plaintiffs filed an application for attorneys' fees and expenses of $1,869,000, representing $1,803,921.21 in fees and $65,078.79 in expenses. *See* Doc No. 77. That request was within the range of the parties' "high-low" agreement. BMW partially[1] opposes Plaintiffs' application and suggests that the Court award $944,000 in attorneys' fees. To justify this, BMW ignores binding precedent, misstates facts and mischaracterizes the relief provided in this excellent settlement.

First, BMW argues that because part of this settlement is "claims-made," it is not a common fund settlement and therefore the lodestar method must be used to evaluate Plaintiffs' fee application. BMW is incorrect. The Third Circuit has repeatedly held that settlement structures like this are "common fund" settlements and the percentage-of-recovery method should be used.

Second, BMW claims that Plaintiffs' submission regarding counsel's time is "inadequate" to allow the Court to confirm that the hours expended were reasonable and necessary. However, BMW fails to acknowledge that such "bean-counting" is not required when utilizing the percentage-of-recovery method and the associated lodestar "cross-check." Even if the Court used the lodestar method, BMW ignores multiple decisions from this Court—including a recent decision involving BMW and its counsel—that found Plaintiffs' submission to provide the level of detail required.

Finally, BMW claims that the Plaintiffs' $8.6 million settlement valuation is inflated and should be only $2-4 million. Setting aside that BMW offers no expert opinion of its own to rebut Mr. Kleckner's valuation, BMW's arguments regarding Mr. Kleckner's analysis are simply wrong.

For the reasons set forth more fully below, Plaintiffs' application should be granted.

---

[1] BMW does not oppose Class Counsel's request for $65,078.79 in expenses or the requested service awards to the Class Representatives of $3,000 each ($6,000 total).

1

## LEGAL ARGUMENT

### POINT I

#### PLAINTIFFS' FEE APPLICATION SHOULD BE EVALUATED USING THE PERCENTAGE-OF-RECOVERY METHOD

BMW relies on two arguments to support its claim that this is not a common fund settlement, so the lodestar method must be utilized. First, BMW asserts that because part of this settlement is "claims-made," it cannot be common-fund. *See* Doc. No. 80 at 2 ("Def. Br"). In support, BMW relies on a single, unreported case, *McLellan v. LG Electronics USA, Inc.*, No. 2:10-cv-03604, 2012 WL 686020 (D.N.J. Mar. 2, 2012). However, as this Court is well-aware, *McClellan* did not espouse the general proposition that only the lodestar method should be used in claims-made settlements; rather the court reiterated the longstanding principle that the "lodestar method is more appropriate in cases where the nature of recovery does not allow the determination of the settlement's value." *Id*. at *9. Because the parties in *McClellan* did not provide a valuation to the court, the lodestar method was the **only** option to evaluate the attorney fee request. *Id*. In contrast, here, Plaintiffs provided this Court with a reasonable valuation of $8.6 million, supported by expert testimony, which requires this Court to utilize the percentage-of-recovery method.

Moreover, the *McClellan* court cited approvingly to *Dewey v. Volkswagen*, 728 F.Supp.2d 546, (D.N.J. 2010), rev'd on other grounds, 681 F.3d 170 (3d Cir. 2012), which had a settlement virtually identical in structure to the settlement here: class members could bring their vehicles to an authorized dealer to have the defect repaired free of charge and could also submit claims for reimbursement of past out of pocket expenses. *Id*. at 561. Even under that settlement structure, then-Magistrate Patty Shwartz determined that the settlement constituted a common fund and the percentage-of-recovery method should be used to evaluate the attorney fee request:

> Besides classic common fund cases, the percentage-of-recovery method is also appropriate "where, although the parties claim that the fee and settlement are independent, they actually come from the same source." The Court can apply the

2

> "common fund" principles when the fees and settlement are paid by the same source even though the fees are not actually drawn from a fund established for the class…. [Here,] the benefits of this settlement to the class and counsel fee are being voluntarily paid by a single source, namely, the defendants. The fact that the defendants did not agree to a precise amount as part of the settlement agreement and has disputed the amount sought does not preclude using the percentage-of-recovery method because the value of the settlement can be calculated, the defendants agreed to pay fees, and the payment of both "the fee and settlement ... come from the same source."

*Id*. at 591 (citations omitted) (citing *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768 (3d Cir. 1995)).

When the Third Circuit reviewed Judge Shwartz's decision, it agreed that utilizing the percentage-of-recovery method was appropriate:

> Granted, this case does not involve a true common fund because Volkswagen is paying the fee out of its own pocket and not through the reimbursement fund. However, where the reality is that the fund and the fee are paid from the same source—in this case, Volkswagen—the arrangement "is, for practical purposes, a constructive common fund," and courts may still apply the percent-of-fund analysis in calculating attorney's fees.

*Dewey v. Volkswagen*, 558 Fed.Appx. 191, 197 (3d Cir. 2017) (citing *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 820-21 (3d Cir. 1995)). *See also Alin v. Honda Motor Co.*, No. 08-4825 KSH, 2012 WL 8751045, *19 (D.N.J. Apr. 13, 2012) (awarding fees of $2,423,523.23 based on percentage of the benefit conferred, which consisted of partial reimbursements for vehicle repairs). Thus, the Third Circuit unequivocally holds that even in a claims-made settlement, if the court can reasonably value the settlement, then the percentage-of-recovery method should be used to evaluate an attorney fee request.

BMW's second argument in support of utilizing the lodestar method is based on the fact that Plaintiffs have asserted several causes of action under fee-shifting statutes. Def. Br. at 3. This is a curious assertion, particularly as the very case cited by BMW as support stands for the opposite proposition. In *In re Diet Drugs*, 582 F.3d 524, 540 (3d Cir. 2009), the Third Circuit rejected use of the lodestar method to calculate fees in a class action settlement simply because a statutory fee-

3

shifting claim was involved. *Id*. The Third Circuit determined, "there [wa]s no such [fee-shifting] statute at work here. [Defendant] voluntarily undertook the process of compensating opposing counsel, by establishing and funding various escrow accounts dedicated to the payment of claimants' legal costs." *Id*. Accordingly, the Third Circuit determined that the case fell under the common fund doctrine and that the percentage-of-recovery method was appropriate. *Id*.; *see also*, *Dewey*, 728 F.Supp.2d at 591-92 (utilizing percentage-of-recovery method despite assertion of claims that contain fee-shifting provision when defendants voluntarily agree to pay attorneys' fees).

In sum, binding Third Circuit precedent requires using the percentage-of-recovery method[2] to evaluate Plaintiffs' attorneys' fee application because the benefit achieved for the Class is considered a common fund.

**POINT II**

**CLASS COUNSEL'S APPLICATION IS SUFFICIENTLY SPECIFIC TO DEMONSTRATE THAT THE REQUESTED FEES ARE REASONABLE**

BMW next argues that Plaintiffs' submissions are inadequate to allow the Court to determine whether the hours expended were reasonable and necessary. Def. Br. at 3-7. However, BMW's arguments are not relevant when the percentage-of-recovery method is used to evaluate a fee request. Under the percentage-of-recovery method, Class Counsel's hours are only used during the lodestar cross-check. "The lodestar cross-check serves the purpose of alerting the trial judge that when the multiplier is too great, the court should reconsider its calculation under the percentage-of-recovery method, with an eye toward reducing the award." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306

---

[2] Even if BMW was correct that the lodestar method should be used, Plaintiffs demonstrated that the requested fee is reasonable by performing a lodestar "cross-check." *See* Doc. No. 77-1 at 18-20. Accordingly, BMW's insistence on utilizing the lodestar method does not change the outcome—$1,803,921.21 in attorneys' fees is completely justified and appropriate. *See also Dyer v. Wells Fargo Bank, N.A.*, No. 13-CV-02858-JST, 2014 WL 5369395, at *6 (N.D. Cal. Oct. 22, 2014) ("A 2.83 multiplier falls within the Ninth Circuit's presumptively acceptable range of 1.0–4.0. Given the complexity and duration of this litigation, the results obtained for the class, and the risk counsel faced in bringing the litigation, the Court finds the 2.83 multiplier appropriate." (citation omitted)).

4

(3d Cir. 2005). The cross-check, however, "does not trump the primary reliance on the percentage of common fund method." *Id*. at 307. Moreover, the lodestar cross-check entails "neither mathematical precision nor bean-counting," and the court "need not review actual billing records," but rather may rely on summaries submitted by attorneys. *Id.* at 306-07, citing *In re Prudential Ins. Co. Am. Sales Prac. Litig. Agent Actions*, 148 F.3d 283, 342 (3d Cir. 1998).[3] Here, Class Counsel has actually submitted more information than is necessary for the Court to perform the necessary lodestar cross-check. *See Alin v. Am. Honda Motor. Co. Ltd.*, No. 08-4825-KSH, 2012 WL 8751045, *18 (D.N.J. Apr. 13, 2012) (accepting only total hours expended by each attorney as sufficient to perform lodestar cross-check).

Nevertheless, even under a pure lodestar analysis, Plaintiffs have submitted sufficient information for the Court to evaluate the reasonableness of the requested fees. Each of the three firms representing Plaintiffs submitted detailed affidavits setting forth the work performed, broken down by individual lawyer and hourly rates, and divided that work into eight separate categories: (1) pre-filing investigation and pleadings; (2) post-filing investigation, discovery (including meet & confer and appearances) & document review; (3) motions to dismiss, related documents and research; (4) motion for class certification, related documents and research; (5) preparing for and attending mediation; (6) settlement negotiations, Settlement Agreement (and related documents) and research; (7) settlement motions (and related documents), appearances and research; and (8) settlement administration and post-settlement communications with Class Members.

In addition, Plaintiffs' Motion and supporting declarations provide a detailed summary and

---

[3] *See also, Rode v. Dellarciprete*, 892 F.2d 1177, 1190 (3d Cir. 1990) (quoting *Lindy Bros. Builders, Inc. of Phila. v. American Radiatory & Standard Sanatory Corp*., 487 F.2d 161, 167 (3d Cir. 1973) (although a "fee petition should include 'some fairly definite information as to the hours devoted to various general activities, e.g., pretrial discovery, settlement negotiations and the hours spent by various classes of attorneys, e.g., senior partners, junior partners, associates… it is not necessary to know the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney.").

5

chronology of the work performed. *See e.g.*, Declaration of Matthew R. Mendelsohn, Doc. No. 77-2, ("Mendelsohn Dec."), ¶¶ 2-13. These submissions satisfy the *Rode* standard by specifying "the hours devoted to various general activities" and providing information regarding the exact hours spent by each attorney, which exceeds *Rode's* requirement of providing information regarding the hours spent by various "classes of attorneys."

Despite this, BMW insists that Plaintiffs' submissions do not provide sufficiently specific information. Def. Br. at 3-6. But BMW does not suggest that any of the services for which counsel are seeking fees were not performed, or even that counsel expended an unreasonable number of hours; indeed BMW concedes that Class Counsel is entitled to at least $944,000, which slightly exceeds the lodestar at the time of the submission. Instead, BMW makes a general complaint and cites to a single category where the most hours were expended as an "example"—Category 2: Post-filing investigation, discovery (including meet & confer and appearances) & document review—to argue that Plaintiffs' counsel must justify the 424.3 hours spent in that category. Category 2 encompasses a large portion of the discovery process and therefore would have the most hours. Moreover, the tasks included in Category 2 are explained in counsel's declarations, including: Rule 16 and Rule 26 obligations; drafting discovery requests; responding to discovery requests; reviewing BMW's discovery responses; reviewing, logging and coding BMW's document production; meet-and-confer efforts regarding discovery; submissions regarding discovery issues to the Court; third-party discovery; communications with experts; communications with Plaintiffs; communications with putative class members; communications/meetings with defense counsel and the Court; Court appearances, status calls and status conferences; and deposition preparation and participation. *See* Mendelsohn Dec., ¶¶ 10-11. Class Counsel should be praised for accomplishing these tasks in under 500 hours, not ridiculed.

Further, BMW's argument that individual time entries are required is not supported by *Rode* or other authority. Nowhere does *Rode* state that submissions must contain the dates tasks were performed; nor does *Rode* state that submissions must include the amount of time spent on each <u>task</u> or what a specific task was. Instead, under *Rode*, submissions must include a description and time

spent on general activities, which is what Plaintiffs have provided. Again, *Rode* expressly states: "[I]t is not necessary to know the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney." *Rode* 892 F.2d at 1190.

Defendants cite to various cases where plaintiffs' submissions allegedly contain more specific information than that presented by Plaintiffs' counsel here and were found by the court to be acceptable. Although each of these cases provides an example of adequate specificity under its facts, none of these cases support BMW's argument that the information and records submitted by Plaintiffs here are insufficient. In fact, each of these decisions cites to the standard set forth in *Rode,* and each acknowledges that "it is not necessary to know the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney."

Further, *Rode* recognizes the value and usefulness of submitting summaries of time. The *Rode* plaintiffs submitted itemized billing records but did not submit summaries of the time grouped by activity. The district court chastised plaintiffs for simply attaching time records to the petition, and in fact reduced their hours for lack of specificity, stating:

> A well prepared fee petition also would include a summary, grouping the times entries by the nature of the activity or stage of the case. [if] Plaintiffs' attorneys have failed to ...group the time spent by each lawyer and paralegal by activity. They have simply appended individual time records to their fee petition. The records themselves are in simple chronological order, making it extremely difficult to determine the total hours spent by all individuals on any particular motion, issue or part of the case...

*Rode* 892 F.2d at 1189. While the Third Circuit ultimately concluded that a summary is not required because in part it "places an onerous burden on the fee petitioner," it also recognized that the district court provided instruction to fee petitioners "that summaries are one way of aiding the district court in its endeavor" to determine the reasonableness of fee petitions. *Rode* 892 F.2d at 1190. Thus, *Rode* confirms that time summaries grouped by activity assist the court in determining whether the fees are reasonable, and that it is "extremely difficult" for a court to analyze the reasonableness of fees by looking only at billing records.

Here, the underlying time records consist of billing entries for three law firms over the course

7

of more than three years, encompassing hundreds, if not thousands, of entries.[4] Plaintiffs willingly took on the burden of categorizing and summarizing their time by category to simplify the Court's task of evaluating the fee request and have attested to this process. Plaintiffs have provided more than "sufficient information" for the Court to determine whether the fees are reasonable.

Interestingly, BMW neglects to cite to one of the most recent decisions addressing this issue, *Skeen v. BMW of N. Am.*, No. 2:13-cv-01531, which involved BMW and its current counsel. In fact, much of BMW's argument here is "cut-and-pasted" from its opposition to the plaintiffs' attorney fee application in *Skeen*. *Compare* Def. Br.. at 3-7 with *Skeen,* Doc. No. 90 at 2-6. Despite BMW's use of recycled arguments, BMW neglects to cite to Judge Walls' rejection of its aruments:

> Defendants argue, generally, that Plaintiffs' application for fees is insufficient because some courts within the Third Circuit have approved attorneys' fees based on more detailed documentation than Plaintiffs submit here, including itemized, hourly billing records for each attorney….**The Court does not deny that Plaintiffs *could* submit further documentation, and Plaintiffs have offered to submit detailed time records for the Court's *in camera* review if so required. But "it is not necessary" for the Court to "know the exact number of minutes spent nor the precise activity to which each hour was devoted nor the specific attainments of each attorney" in order to determine whether the number of hours billed was reasonable.** *Rode*, 892 F.2d at 1190. In any event, as Plaintiffs suggest, "what was actually *done*" at these meetings likely includes protected attorney work product. **The Court will not require Plaintiffs to submit further documentation….**

*Skeen v. BMW of N. Am., LLC*, 2016 WL 4033969, at *22 (D.N.J. July 26, 2016) (citations omitted and emphasis added). Like the *Skeen* plaintiffs, Class Counsel's submission is sufficiently specific[5].

## POINT III

## PLAINTIFFS HAVE PRESENTED A REASONABLE VALUE OF THE SETTLEMENT

---

[4] Importantly, L. Civ. R. 54.2(a)(5) states that "[c]omputerized timesheets…*may* be utilized ..." (emphasis added).

[5] If requested by the Court, Class Counsel are willing to submit their time records for an *in camera* review. These records contain significant amounts of information protected by the attorney-client and work product privileges, and therefore are not appropriate for disclosure.

8

In order to attack Plaintiffs' attorney fee request, BMW claims that the settlement valuation provided is inflated and incorrect. In fact, it is BMW who is mistaken. The alleged "problems" with the valuation are due solely to BMW's failure to carefully review Mr. Kleckner's Declaration, or in the alternative, its willful misinterpretation of Mr. Kleckner's methodology. In either case, BMW's arguments have no merit and should be summarily rejected.

### A.  Mr. Kleckner Utilizes the Correct Number of Class Vehicles in His Calculations

BMW argues that "by completely ignoring the fact that 37% of the 30,344 potential class vehicles were already repaired by BMW before this settlement was reached, Kleckner bloats his valuation of settlement benefits." Def. Br., pg. 8. BMW is wholly incorrect.

First, this argument is completely disingenuous. As BMW knows, it did not have an actual "fix" for the Convertible Top Defect prior to coming up with the Software Update that is a part of the relief in this Settlement. BMW's own corporate designee, Robert Coake, confirmed this:

> Q. Now, this ["Software Update"], I guess just for informational purposes, is dated January 2016, and it indicates that it supersedes the previous [Service Bulletins] that we spoke about…is that correct?
>
> A. Yes.
>
> Q. Now, again, this is addressing the same situation that -- same complaints that were being addressed in [the previous Service Bulletins], that the convertible top does not completely open or close, correct?
>
> A. Correct.
>
> \*                    \*                    \*
>
> Q. Well, this [Software Update], at least based on my reading, institutes a fix or correction for [the Convertible Top Defect], correct?
>
> A. Yes.

Deposition of Robert Coake, attached as Exhibit A to the Supplemental Declaration of Matthew R. Mendelsohn ("Mendelsohn Supp. Dec.") at 63:21-64:23. This is further confirmed by BMW's warranty data, which shows countless Class Vehicles repeatedly requiring "repair" of the defect.

The fact that BMW had not developed a remedy for the Convertible Top Defect prior to

9

developing the Software Update is not in dispute.[6] No Class Vehicle has had the Convertible Top Defect completely repaired yet, because none has yet received the Software Update. Accordingly, all Class Vehicles—not just the ones BMW has not tried to fix—are properly included in settlement valuation and do not constitute over-inclusion.

Second, despite there being no prior "fix" for the Convertible Top Defect, to err on the side of a conservative valuation, Mr. Kleckner **excluded** owners who had previous repair attempts performed by BMW. In other words, Mr. Kleckner did the very thing that BMW criticizes him for not doing. BMW would have realized this had it bothered to carefully review Mr. Kleckner's declaration and its exhibits:

| Average Number of Owners That Incurred Applicable Post Warranty Period Repair Costs | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Average Number of Owners | 2.7 | 2.7 | 2.7 | 2.7 | 2.7 | 1.9 | 1.9 | |
| Number of Subject Vehicles Sold | 3,324 | 6,472 | 5,421 | 6,329 | 5,050 | 1,776 | 1,972 | |
| Estimated Number of Owners Before Adjustments | 8,975 | 17,474 | 14,637 | 17,088 | 13,635 | 3,374 | 3,747 | 78,930 |
| Less Warranty Period Claim Owners | (1,059) | (3,323) | (1,237) | (3,352) | (1,519) | (379) | (356) | (11,225) |
| Less Goodwill Claim Owners | (163) | (676) | (246) | (542) | (192) | (53) | (34) | (1,906) |
| Less Certified Pre-Owned Claim Owners | (62) | (300) | (148) | (418) | (293) | (62) | (26) | (1,309) |
| Less Estimate of Extended Service Contract Owners | (997) | (1,942) | (1,626) | (1,899) | (1,515) | (533) | (592) | (9,104) |
| Estimated Average Number of Owners | 6,694 | 11,233 | 11,380 | 10,877 | 10,116 | 2,347 | 2,739 | 55,386 |
| Calculated Percentage That Will Pay For Repair | 40.7% | 37.6% | 34.5% | 31.4% | 28.4% | 25.3% | 22.2% | 33.2% |
| | 2,724 | 4,225 | 3,929 | 3,420 | 2,869 | 593 | 608 | 18,368 |

See Declaration of Kirk Kleckner, Ex. F, Doc. No. 77-5 ("Kleckner Dec.") (emphasis added). As Exhibit F shows, Mr. Kleckner's valuation analysis did **not** include Class Vehicle owners that had a repair performed under the New Vehicle Limited Warranty, Certified Pre-Owned Warranty, Goodwill Program or an Extended Service Contract. Id. While some of such Class Vehicle owners incurred additional repairs that could have been included in Mr. Kleckner's valuation, to present the most conservative valuation to the Court, those vehicles were excluded from his analysis. Id.

### B. The Software Update and the Extended Warranty are Distinct Benefits

BMW next argues that Mr. Kleckner "double-counts" by placing separate values on the

---

[6] Plaintiffs' have raised this misrepresentation with BMW's counsel and have advised that consistent with defense counsel's Rule 11 obligations, that it must be withdrawn. BMW has refused to comply with Plaintiffs' request. Mendelsohn Supp. Dec., ¶¶ 3-4, Exhibit B. Nevertheless, BMW's counsel confirmed that "it is not nor has it ever been BMW's position" that "the prior repairs (including prior TSBs) permanently fixed the convertible top issues." Id.

10

extended warranty and the Software Update. Def. Br. at 9. To make this argument, BMW relies on cute wordsmithing, claiming the "warranted software update" already includes the value of the extended warranty. Once again, BMW is incorrect.

The Software Update and the extended warranty are two independent benefits. The value of the Software Update is the cost that a Class Member would incur if s/he went to an authorized BMW service center and paid for the Software Update. BMW has represented that the average amount it will reimburse its authorized service centers to perform each Software Update is $70.15. Mr. Kleckner multiplied $70.15 by the number of Class Vehicles still on the road,[7] which produced a total value of $1,540,000 for the Software Update. *See* Kleckner Dec., §§ 5(c) and 6(a).

Class Members also receive a one-year, unlimited mileage extended warranty for their convertible top. This extended warranty is not part of the $70.15 cost to install the Software Update and therefore must be evaluated separately. To determine the value of the extended warranty, Mr. Kleckner calculated the cost for a Class Member to purchase such an extended warranty ($21.28), and then multiplied that by the number of Class Vehicles still on the road. The total value of the extended warranty is thus $470,000. *See* Kleckner Dec., §§ 5(d) and 6(a).

These two distinct benefits each have their own value. BMW seems inclined to combine these benefits by referring to them jointly as the "warranted software upgrade." If BMW insists on evaluating these benefits as a single, combined benefit, that is fine, but it does not change the

---

[7] BMW also criticizes Mr. Kleckner's calculation of the number of Class Vehicles still on the road by claiming, "he neither specifies what data he used nor references the NHTSA report he relied upon." Def. Br. at 8, n. 2. Once again, BMW is mistaken. Mr. Kleckner illustrated his calculation of the 21,976 currently existing Class Vehicles three separate times. *See* Kleckner Declaration, Exhibits B, D and F. Mr. Kleckner further referenced the NHTSA report relied upon by including in "EXHIBIT B – Primary Materials Considered" the following: "Vehicle Survivability and Travel Mileage Schedules, January 2006, National Highway Traffic Safety Administration." *Id*. Nevertheless, to save BMW the trouble of having to search for this publicly available report (https://crashstats.nhtsa.dot.gov/Api/Public/ViewPublication/809952), Mr. Kleckner attaches it as Exhibit 1 to his Supplemental Declaration ("Kleckner Supp. Dec."), submitted herewith.

11

valuation. The value of BMW's "warranted software upgrade" is $91.43 ($70.15 for the software portion and $21.28 for the extended warranty portion).

### C. Mr. Kleckner Properly Calculates the Value of the Potential Reimbursements

Next, BMW argues that Mr. Kleckner overstates the value of potential reimbursements by assuming each Class Vehicle to have had an average of 2-3 owners and that "each and every owner in the chain will incur a separate repair expense associated with the class vehicles, as opposed to the potential that every *vehicle* might incur an expense." Def. Br. at 10. BMW is incorrect.

Class Vehicles, being inanimate objects, do not pay for repairs, their owners do. Accordingly, Mr. Kleckner had to determine what the likelihood was that each Class Member incurred an out-of-pocket expense to "repair" the Convertible Top Defect. To do that, Mr. Kleckner had to determine the number of "in-service" years for each Class Vehicle, factor in the number of Class Members who would have owned the Class Vehicle during the "in-service" years, calculate how many of those Class Members would have sustained a failure, and then reduce that population by the number Class Members who would choose not to pay for the repair. *See* Kleckner Dec., §§ 5(e) and 6(a). Over the course of the average number of post-warranty years, Mr. Kleckner determined that 18,368 "repairs" would have been made. *Id*., Exhibit F. Understanding that one cannot simply compare the number of repairs made to the number of Class Vehicles because many Class Vehicles likely had multiple repairs and some Class Vehicles had none, the 18,368 repairs would represent an approximate 60% failure rate based on the total number of Class Vehicles that have been sold.[8]

Instead of retaining its own valuation expert, BMW relies on its counsel to construct a "back-of-the-napkin" valuation, which it argues is more accurate than Mr. Kleckner's mathematical

---

[8] BMW did not take Mr. Kleckner's deposition, where it could have sought clarification and obtained a greater understanding of Mr. Kleckner's analysis. Nevertheless, Mr. Kleckner provides even greater detail regarding his calculations and analysis in his Supplemental Declaration.

12

analysis. Def. Br., Pg. 10. BMW's "analysis" consists of applying the warranty repair rates and the average cost of such repairs, to the number of Class Vehicles still on the road today. According to BMW, the potential reimbursements are therefore more properly valued at $2.88 million.[9] There are many reasons this "analysis" is faulty, some of which are explained below.

First, one cannot just utilize the number of Class Vehicles that remain on the road today (21,976) and simply forget about the other 8,500 Class Vehicles, pretending that they never existed. Every year a certain number of Class Vehicles are removed from service. But each of those Class Vehicles was in-service for a period and therefore was at risk of sustaining a convertible top failure. That is why Mr. Kleckner utilizes an annual claim occurrence rate and then accounts for how long each Class Vehicle remained in-service after the warranty period. *See* Kleckner Dec., §§ 5(e) and 6(a), Ex. F. Simply ignoring almost 1/3 of the Class Vehicles deflates the potential value by a similar amount. Using BMW's "methodology" and accounting for the Class Vehicles it improperly excludes results in the following valuation for the reimbursement portion of the settlement:

| Claims from Class Vehicles (30,344) | | | | |
|---|---|---|---|---|
| Repair Type | Warranty Claims Rate | # of Vehicles | Repair Cost | Total |
| Adjust Sensor | 9.50% | 2,883 | $168.36 | $485,381.88 |
| Replace Sensor | 27.01% | 8,196 | $247.93 | $2,032,034.28 |
| Replace Top | .470% | 143 | $10,229.93 | $1,462,879.99 |
| | | | | **$3,980,296.15** |

BMW's analysis contains an additional flaw. The "claims rate" BMW uses is the percentage of the Class Vehicles (30,344) that incurred each type of repair. This "claims rate," however, only captures repairs during the four-year warranty period. Obviously, if repairs were captured over an eight-year period, one would expect the claims rate to be about double, and so on. As an example, 2004 Class Vehicles that are still on the road today have been out of warranty for approximately 10

---

[9] Plaintiffs will not repeat their arguments regarding why Class Vehicles previously "repaired" can sustain additional failures. Accordingly, there is no need to even comment on the absurdity of BMW's "analysis" that removes such vehicles from consideration. Def. Br. at 10.

13

years, or 2.5 times the length of time captured in the warranty database. Even if one only assumed that the average Class Vehicle has been out of warranty 1.5 times longer than vehicles captured in the warranty database (*i.e.*, a 50% increase in claims rate), this would yield the following valuation:

| Claims from Class Vehicles (30,344) | | | | |
|---|---|---|---|---|
| Repair Type | 1.5 x Warranty Claims Rate | # of Vehicles | Repair Cost | Total |
| Adjust Sensor | 14.25% | 4,324 | $168.36 | $727,988.64 |
| Replace Sensor | 40.52% | 12,295 | $247.93 | $3,048,299.35 |
| Replace Top | 0.71% | 215 | $10,229.93 | $2,199,434.95 |
| | | | | **$5,975,722.94** |

In short, defense counsel's "analysis" does nothing but demonstrate why most of us are lawyers and not mathematicians. Nevertheless, even if the Court accepted BMW's flawed methodology, once BMW's errors are accounted for, the reimbursement portion of the settlement is valued at approximately $6 million, compared to Mr. Kleckner's $6.5 million valuation. Whether the settlement is ultimately valued at a total of $8 million (under BMW's analysis) or $8.5 million (based on Plaintiffs' analysis) does not alter the fact that Class Counsel's fee request is justified.

**D. The Settlement Value is Based on the Benefits Made Available to the Class**

BMW's final criticism of Mr. Kleckner's analysis is that it "assumes 100% of the Class will make a claim." Def. Br. at 11. Mr. Kleckner has made no such assumption. Mr. Kleckner was simply tasked with calculating the total value of the benefits made available to the Class, not make any assumptions regarding a potential claims rate. It is Plaintiffs who assert that the valuation should be based on the value of the benefits made available and not based on actual claims. This position is supported by ample United States Supreme Court and Third Circuit precedent.

Valuation is properly based on the total "value of the settlement to the class" and is <u>not</u> reduced even if some Class Members may choose not to take advantage of the settlement's benefits. *Weiss v. Mercedes-Benz of N. Am.*, 899 F. Supp. 2d 1297, 1304 n. 5 (D.N.J. 1995). In *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980), the Supreme Court held that in a class action settlement, attorney fees

14

should be awarded based upon **the value of the benefits made available to the class as a whole**, and not merely the benefits actually claimed:

> [T]he named respondents have recovered a determinate fund for the benefit of every member of the class . . . . **Their right to share the harvest of the lawsuit** upon proof of their identity, **whether or not they exercise it, is a benefit in the fund created by the efforts of the class representatives and their counsel**. Unless absentees contribute to the payment of attorney's fees incurred on their behalves, they will pay nothing for the creation of the fund and their representatives may bear additional costs. The judgment entered by the District Court and affirmed by the Court of Appeals rectifies this inequity by requiring every member of the class to share attorney's fees to the same extent that he can share the recovery.

*Boeing*, 444 U.S. at 478, 480 (citations omitted) (emphasis supplied). *See also Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 436-37 (2d Cir. 2007) ("An allocation of fees by percentage should therefore be awarded on the basis of the total funds made available, whether claimed or not."); *Saint v. BMW of N. Am.*, No. 12-6105-CCC, 2015 WL 2448846, *17 (D.N.J. May 21, 2015) ("[T]he right of class members to share the harvest of the lawsuit upon proof of their identity ... is a benefit in the fund created by the efforts of the class representative and their counsel.") (quotation omitted); *Landsman & Funk, P.C. v. Skinder-Strauss Assocs.*, No. 08-3610-CLW, 2015 WL 2383358, at *8 (D.N.J. May 18, 2015), aff'd, 639 F. App'x 880 (3d Cir. 2016) ("[A]ttorney's fees in reverter cases should be calculated based on the entire common fund, as opposed to by the amount claimed by class members."); *Doherty v. Hertz Corp.*, No. 10-359-NLH, 2014 WL 2916494, at *7 (D.N.J. June 25, 2014) ("[T]he law supports an award of reasonable attorney's fees to Class Counsel based on the gross settlement—the monies potentially available to be claimed—without regard to the amount actually claimed by Class Members."); *Alin*, 2012 WL 8751045 at *20 (same).

The Settlement is appropriately valued at $8.6 million, the minimum value of benefits made available to the Class, and is not reduced because some Class Members have not made a claim.

## CONCLUSION

Plaintiffs' application for an award of attorney's fees and costs should be granted.

15

Respectfully submitted,

_____
Matthew Mendelsohn
**MAZIE SLATER KATZ & FREEMAN, LLC**
103 Eisenhower Parkway
Roseland, New Jersey 07068
Telephone:  (973) 228-9898
Facsimile: (973) 228-0303
e-mail: mmendelsohn@mskf.net

## **CERTIFICATE OF SERVICE**

      I certify that the foregoing document is filed or will be filed through the Court's ECF system and thereby will be sent electronically to the registered participants identified on the Notice of Electronic Filing on today's date.

                                                      Matthew R. Mendelsohn

Dated: July 13, 2017